IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMANDA FRANCES, INC., | Civil Action No. |
| Plaintiff, | |
| v. | |
| PENGUIN RANDOM HOUSE LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR TEMPORARY
RESTRAINING ORDER & PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................. 1

II.   STATEMENT OF FACTS ...................................................................................... 3

    A.    AF Inc. ............................................................................................................ 3

    B.    AF Inc.'s Valuable Intellectual Property Rights ........................................... 4

        1.    Brand Development and Success .......................................................... 4

        2.    Trademark Rights in Rich As F*ck ..................................................... 10

        3.    The AF Inc. Trade Dress ...................................................................... 11

    C.    Defendant's Improper Conduct ..................................................................... 12

    D.    Notice to Defendant ...................................................................................... 17

III.  LEGAL STANDARD ........................................................................................... 17

IV.   ARGUMENT ........................................................................................................ 18

    A.    AF Inc. Is Likely to Succeed on the Merits of Its Claims ............................ 18

        1.    Federal Unfair Competition ................................................................ 18

            a)    AF Inc. Has Protectable Trademark Rights in Rich As F*ck ....... 18

            b)    Defendant's Use of the title *Rich AF* Is Likely to Cause
                 Consumer Confusion .................................................................... 21

        2.    Trade Dress Infringement Under the Lanham Act ................................. 23

            a)    The AF Inc. Trade Dress Is Distinctive ........................................ 23

            b)    The AF Inc. Trade Dress Is Non-Functional ............................... 25

            c)    A Likelihood of Confusion Exists ................................................ 25

        3.    New York State Trade Dress Infringement and Unfair Competition ....... 27

            a)    Defendant Infringes AF Inc.'s Trade Dress Under New York
                 Common Law ................................................................................ 27

            b)    AF Inc. Has a Strong Claim for Unfair Competition Under
                 New York Law .............................................................................. 27

        4.    Unfair Trade Practices ......................................................................... 28

        5.    Unjust Enrichment .............................................................................. 29

        6.    New York State Trademark Dilution .................................................... 29

    B.    AF Inc. Has Suffered and Will Continue to Suffer Irreparable Harm ................. 30

    C.    The Balance of Hardships and Public Interest Weigh in Favor of AF Inc. .......... 31

V.    CONCLUSION ..................................................................................................... 32

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
  537 F.2d 4 (2d Cir. 1976)................................................................................... 24

*Avon Prods. v. S.C. Johnson & Son, Inc.*,
  984 F.Supp. 768 (S.D.N.Y. 1997) ..................................................................... 28

*Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*,
  No. 15-CV-1092, 2015 U.S. Dist. LEXIS 24013 (S.D.N.Y. Feb. 26, 2015) ...................... 17, 18

*Best Cellars, Inc. v. Wine Made Simple, Inc.*,
  320 F.Supp.2d 60 (S.D.N.Y. 2003) ............................................................ 22, 23, 24

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
  348 F.Supp.2d 217 (S.D.N.Y. 2004)................................................................... 27

*Cartier, Inc. v. Sardell Jewelry, Inc.*,
  294 F. App'x 615 (2d Cir. 2008) ....................................................................... 19

*Centaur Communs., Ltd. v A/S/M Communs., Inc.*,
  830 F.2d 1217 (2d Cir. 1987)............................................................................ 19

*Charles of the Ritz Grp. Ltd. v. Quality King Distribs., Inc.*,
  832 F.2d 1317 (2d Cir. 1987)............................................................................ 30

*Dreyfus Fund, Inc. v. Royal Bank of Canada*,
  525 F.Supp. 1108 (S.D.N.Y. 1981) ................................................................... 29

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.*,
  228 F.3d 56 (2d Cir. 2000),
  amended by 2000 U.S. App. LEXIS 30761 (2d Cir. 2000) ...................................... 19

*EnergyBrands Inc. v. Beverage Mktg. USA, Inc.*,
  No. 02-CV-3227, 2002 U.S. Dist. LEXIS 7763 (S.D.N.Y.  May 1, 2002)............................ 17

*Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*,
  808 F.Supp. 952 (E.D.N.Y. 1992) ..................................................................... 31

*Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*,
  111 F.3d 993 (2d Cir. 1997)................................................................... 18, 23, 24

*Gucci Am., Inc. v. Gucci*,
  No. 07 Civ. 6820 (RMB)(JCF), 2009 U.S. Dist. LEXIS 124888 (S.D.N.Y. Aug. 5, 2009)..... 28

*Ideal Toy Corp. v. Chinese Arts & Crafts, Inc.*,
  530 F.Supp. 375 (1981) .................................................................................. 27

*Inwood Labs., Inc. v. Ives Labs. Inc.*,
  456 U.S. 844 (1982)....................................................................................... 23

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
  58 F.3d 27 (2d Cir. 1995)................................................................................ 30

*Juicy Couture, Inc. v. Bella Int'l Ltd.*,
  930 F.Supp.2d 489 (S.D.N.Y. 2013)................................................................... 31

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
  97 F.Supp.3d 485 (S.D.N.Y. 2015)............................................................... 21, 25

*N. Atl. Instruments, Inc. v. Haber*,
  188 F.3d 38 (2d Cir. 1999).............................................................................. 17

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
  704 F.Supp.2d 305 (S.D.N.Y. 2010)............................................................... 28, 30

*PAF S.r.l. v. Lisa Lighting Co., Ltd.*,
  712 F.Supp. 394 (S.D.N.Y. 1989) ............................................................... 30

*PDK Labs, Inc. v. Proactive Labs, Inc.*,
  325 F.Supp.2d 176 (E.D.N.Y. 2004) ........................................................... 31

*Perry Street Software, Inc. v. Jedi Techs., Inc.*,
  No. 20-cv-04539-CM, 2020 U.S. Dist. LEXIS 190503 (S.D.N.Y. Oct. 14, 2020) ................. 31

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961) .............................................................. 21, 26

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) ................................................................. 19

*Sugar Busters LLC v. Brennan*,
  177 F.3d 258 (5th Cir.1999) ................................................................. 19

*Tiffany & Co. v Costco Wholesale Corp.*,
  971 F.3d 74 (2d Cir. 2020) .................................................................. 22

*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*,
  17 F.3d 38 (2d Cir. 1994) ................................................................... 19

*Tri-Star Pictures, Inc. v. Unger*,
  14 F.Supp.2d 339 (S.D.N.Y. 1998) ........................................................ 28, 29

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
  505 U.S. 763 (1992) ......................................................................... 24

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*,
  800 F.Supp.2d 515 (S.D.N.Y.2011) ........................................................... 30

*Virgin Enters. v Nawab*,
  335 F.3d 141 (2d Cir. 2003) ............................................................. 18, 26

**Statutes**

15 U.S.C. § 1116(a) ........................................................................... 30

15 U.S.C. § 1125(a)(1) ........................................................................ 18

15 U.S.C. § 1127 .............................................................................. 19

N.Y. Gen. Bus. Law § 349 ..................................................................... 28

## I.   PRELIMINARY STATEMENT

For over six years, Amanda Frances Inc. ("AF Inc.") has offered digital courses, meditations, and trainings that teach women how to grow their wealth so that they can lead the lives they desire. With a background in ministry and mental health counseling and knowledge of spiritual and energetic principles, Amanda Frances, the founder and sole shareholder of AF Inc., imparts her audience with practical advice and guidance on how money works. Ms. Frances's approach focuses on the energy of money and teaches women how to shift their mindset from fear and anxiety to abundance and wealth. Ms. Frances is a self-made entrepreneur who knows these lessons firsthand. She worked three jobs to put herself through college and graduate school, and built AF Inc. from the ground up, growing it into a multimillion-dollar enterprise within four years of its formation.

Since its inception, AF Inc. has invested heavily into creating and promoting a consistent and recognizable brand. AF Inc. leaned into using the swear word "f*ck" as well as AF—the social media and internet acronym for "as f*ck" and also Ms. Frances's initials—to create an edgy, attention-grabbing brand. AF Inc.'s branding also prominently features images of Ms. Frances in various poses with dollar bills surrounding her, projecting an image of an empowered modern woman celebrating her abundance and success.

Defendant Penguin Random House ("Defendant" or "Penguin Random House") has long been aware of Ms. Frances and her success. In September 2019, an editor from the Portfolio division of Penguin Random House, who was a self-proclaimed long-time admirer of Ms. Frances's financial advice and podcast, reached out to Ms. Frances to discuss the possibility of publishing a book by her. At that time, Ms. Frances had already begun to formulate a plan to publish a book. Ultimately, she declined Defendant's offer and decided to self-publish her book. The book was released in December 2020, entitled *Rich As F*ck*—a title that fit squarely into AF

Inc.'s longstanding branding elements, and featuring a cover photo of Ms. Frances in a bathtub full of dollar bills.

It was an immediate success. The day *Rich As F\*ck* was released, it shot to #19 in most sold books in all of Amazon's Kindle Store. For perspective, President Barack Obama's memoir *A Promised Land*, which debuted one month earlier, was listed at #8 at the time. Within its first week, 5,000 copies of *Rich As F\*ck* had been sold, and it was listed on numerous Amazon bestseller lists, including Business & Investing, Spirituality, Women & Business, New Age Religion & Spirituality, Budgeting & Money Management, Religion & Spirituality, and Self-Help. Three years later, *Rich As F\*ck* remains listed as a bestseller on Amazon, with approximately 130,000 copies having been sold. The book has been so successful that Ms. Frances ultimately created a digital course about self-publishing, through which she teaches her audience why they should forego working with traditional publishers like Defendant to make more money and retain more control through self-publishing. The course has generated nearly $1 million in revenue.

Since Defendant was unable to convince Ms. Frances to sign with them, Defendant sought to mirror her success—not by putting in its own creativity and hard work, but by wrongfully trading on the hard-earned goodwill that took Ms. Frances years to build in the Rich As F\*ck name and AF Inc.'s unique look and feel. Specifically, Defendant recently started offering for presale a book with essentially the same title, *Rich AF*, and marketing the book by copying core elements of AF Inc.'s valuable trade dress, such as the term AF and photos of the book's author in nearly identical poses as Ms. Frances, surrounded by dollar bills.

Defendant's *Rich AF* book is set to be released on December 26, 2023. If Defendant is permitted to continue with its book launch, AF Inc. will be significantly harmed, and its business will be irreversibly damaged. In fact, consumers have already begun to express confusion as to

whether a sponsorship exists between Defendant's book and Amanda Frances, based on Defendant's presale activities alone.

AF Inc. only recently learned of Defendant's plans to launch the *Rich AF* book and promptly took action, notifying Defendant of its objections to the book on December 11, 2023. However, Defendant has elected to disregard AF Inc.'s demands and instead proceed with its plans to launch the *Rich AF* book. Therefore, AF Inc. seeks to have a temporary restraining order and a preliminary injunction issued to stop the release of the *Rich AF* book on December 26, 2023.

## II.    STATEMENT OF FACTS

### A.    AF Inc.

Amanda Frances is a renowned thought leader on financial empowerment.[1] Coming from humble beginnings in Oklahoma, Ms. Frances originally pursued a path of academia, receiving a Master of Science degree in counseling from Southern Methodist University in 2013. In 2014, she took a big risk and decided to leave her dream PhD program to focus exclusively on her life coaching business that she had started as a side project while pursuing her master's degree. By the end of that year, Ms. Frances had created her first digital course and begun shifting her focus to money and finances. Amanda Frances Inc. (AF Inc.) was incorporated in 2016. Ms. Frances is the president, sole shareholder, and only employee of the corporation.

Building from the ground up, Ms. Frances quickly grew AF Inc. into a multimillion-dollar enterprise focused on financial growth and improving your money mindset. The core mission of AF Inc. is to empower women to achieve the wealth they need to build the lives they desire by shifting their mindset and thoughts around money.

---

[1] The facts recited herein are verified in AF Inc's Verified Complaint.

### B. AF Inc.'s Valuable Intellectual Property Rights

#### 1. Brand Development and Success

Since the formation of AF Inc., Ms. Frances developed the AF Inc. brand strategically. The word "f*ck" was an intentional part of the AF Inc. brand from the beginning. Coming from a Christian ministry background, Ms. Frances figured that if she could say "God" and "f*ck" in the same sentence, potential clients would know that, although there was a spiritual element to her mindset approach, her mission would be welcoming to people from all walks of life.

"AF" was also an important brand element from the early days of AF Inc. Customer service representatives have called themselves "Team AF" in emails to customers since at least as early as February 2016. *See* Exhibit 1. Although AF was originally intended as a play on Ms. Frances's initials, 2016 was around the time that the term "AF" was gaining huge popularity as an internet and social media acronym for "as f*ck," which fit the AF Inc. brand perfectly. *See* Exhibit 2. Ms. Frances leaned into this double meaning, intentionally using the wording "f*ck" and "AF" in her courses and marketing materials to create a bold, edgy brand.

For example, courses over the years have included: "Building Your Mother F*cking Empire," "Show the F*ck Up," and "Aligned As F*ck." Blog posts on amandafrances.com from over the years have been titled "Become a Mother F*cking Money Genius," "Let It Be F*cking Easy," "So Much F*cking Money," and "The F*cking Abundance Network Marketer." Products available on amandafrances.com include merchandise featuring the wording "Rich As F*ck" and "I Am Rich As F*ck." In 2017, Ms. Frances also started a podcast called "And She Rises the F*ck Up." *See* Exhibit 3.

Examples of AF Inc.'s longstanding use of AF as shorthand for "as f*ck" include blog posts such as such as:

- "How to Always Make the Right Decision (You can't fuck it up)" (May 7, 2018) ("The pressure is restricting AF.")

- "Manifesting Your Ideal Body: Being Hot AF is Your Birthright" (June 2019)

- "MONEY JUST IS: How to Create Certainty and Confidence with Money" (April 13, 2020) ("There are people sharing with me cool AF things that are happening as they enroll in the Energy and Frequency of Money Bundle.")

- "Expanding into New Financial Realities" (September 29, 2020) ("Instant access to seven hours worth of expansive AF content.")

- "God Doesn't Care if you Tithe (I said it)" (March 16, 2021) ("However, I have never run from controversy when it comes to shedding a little light and love on a heavy AF topic.")

- "Mini Bootcamp: How to Pay Off Debt Without Feeling Broke AF" (2017)

- "Aligned AF Living: Mastering the Four Principles" (December 11, 2023)

Merchandise featuring the wording "I Am Rich AF" has been sold on amandafrances.com since as early as November 2016. And logos incorporating AF have been used since at least as early as 2016. *See* Exhibit 4.

Another important part of the AF Inc. brand are the graphics and images used in advertising and selling AF Inc.'s products and services. Specifically, AF Inc. prominently features photos of Ms. Frances surrounded by dollar bills in a number of distinctive ways, creating an overall image of a powerful woman celebrating her abundance and wealth. *See* the examples below:













The style and elements of these images were created through an intentional, creative collaboration between Ms. Frances and her photographer. In 2016, Ms. Frances had her first photo shoot with money. She knew that she had to do something bold and splashy, because money is not a topic you can tiptoe around: you have to go all in. Ms. Frances went to the bank and withdrew thousands of dollars in cash, and then sat down with her photographer to brainstorm. She had never seen an image of a woman in a bathtub full of dollar bills at that time, but that is what they decided to do, in Ms. Frances's own home bathtub. Every year since then, Ms. Frances and her photographer put their heads together to come up with a new creative photo shoot idea, featuring Ms. Frances's real dollar bills, trying out different poses and settings to achieve just the right look.

The AF Inc. brand and its associated products and services resonated in a big way with consumers. By the end of 2017, AF Inc. was generating nearly $200,000 monthly and by 2020, AF Inc. was generating $5 million in annual revenue. Course enrollments grew from roughly 600 customers in 2016 to nearly 4,000 in 2020. The AF Inc. newsletter grew from a few thousand subscribers in 2017, to approximately 20,000 by the end of 2021, and today it has approximately 40,000 subscribers. Additionally, the newsletter has an exceptional percentage of subscribers who actually open the newsletter. Today, the newsletter has a 65% open rate on average, meaning that approximately 20,000 people open and view AF Inc. content every week. The "And She Rises the F*ck Up" podcast has had approximately 2.5 million downloads since its inception, and 24,000 downloads this month alone. And Ms. Frances has over half a million followers on Instagram, through which she posts content almost daily.

The success of AF Inc. caught the attention of Defendant years ago. On September 11, 2019, an editor associated with Defendant who was "a long-time admirer" of Ms. Frances's financial advice and podcast emailed Ms. Frances to discuss the possibility of turning her work

into a book, to be published by Penguin Random House. *See* Exhibit 5. The editor was associated with a division of Defendant called Portfolio, which focuses on nonfiction books featuring "authors [who] are innovators, entrepreneurs, and experts who aren't afraid to take risks and change the world, and who reflect the diversity of voices, identities, experiences, and goals we see in our community of readers." *See* Exhibit 6.

In fact, at that time, Ms. Frances had already begun formulating a plan to publish a book. Ms. Frances carefully considered Defendant's offer, but ultimately declined, having assessed that it would be a better business decision to self-publish her book in order to have the most control over the branding and content of her book, and to retain a larger share of the proceeds.

From October 2019 to December 2020, Ms. Frances worked tirelessly on her book, squeezing in hours of writing during the evenings and weekends, while still running and growing her business during the regular work week. In line with her typical innovative spirit, she also launched a unique type of "book club" to allow fans to follow along on the book writing journey. Over 300 people enrolled, reviewing new chapters of the book as Ms. Frances finished writing them. Book club members would eagerly await the release of each new chapter over the course of 14 months, adding to the buildup and buzz of the book ultimately being released. Ms. Frances knew early on in the process that she would call the book *Rich As F\*ck* because it fit perfectly into the AF Inc. brand: f\*ck, "as f\*ck", and its shorthand AF had long been elements that Ms. Frances had consciously used in the promotion and sales of her products and services.

AF Inc. launched the *Rich As F\*ck* book on December 17, 2020 as an ebook on Amazon, and it was an immediate success. Within its first week, *Rich As F\*ck* had sold over 5,000 copies and was listed on numerous Amazon bestseller lists, including Business & Investing, Spirituality, Women & Business, New Age Religion & Spirituality, Budgeting & Money Management,

Religion & Spirituality, and Self-Help. A month after its release as an ebook, a paperback version of *Rich As F\*ck* was released. In December of 2021, the audiobook version of *Rich As F\*ck* was released.

Each version of the book shot to number one on Amazon in categories such as Women in Business, Spirituality, Economics, and Personal Finance. The ebook version was #19 in most sold books in all of Amazon's Kindle Store the day it was released. For perspective, President Barack Obama's memoir *A Promised Land*, which debuted one month earlier, was listed at #8 at the time. Additionally, the audiobook was the fastest growing book in all of Audible within 48 hours of being released. The book is now available for purchase in multiple formats at retailers such as Target, Barnes & Noble, Books-A-Million, Walmart, and Powell's, among others. *See* Exhibit 7.

### 2.     Trademark Rights in Rich As F\*ck

Since the publication of the *Rich As F\*ck* book over three years ago, the designation Rich As F\*ck has been exclusively associated with AF Inc. and Amanda Frances in connection with financial advice books and related products. On information and belief, no other financial advice book or related product has been available for purchase using this title or a confusingly similar designation over the last three years until Defendant began offering for presale the *Rich AF* book at issue. Based on AF Inc's longstanding, exclusive use of the designation Rich As F\*ck in connection with a financial advice book, consumers have come to recognize Rich As F\*ck not merely as the title of a book, but rather as a designation of source, namely, that financial advice books and related products or services sold or marketed in connection with the designation Rich As F\*ck originate from or are associated with Amanda Frances and AF Inc. This consumer association establishes secondary meaning, such that AF Inc. has protectable trademark rights in Rich As F\*ck.

The secondary meaning associated with Rich As F*ck is further supported by the overwhelming success of the *Rich As F*ck* book, as well as the fact that AF Inc. has invested significantly in advertising and promoting the *Rich As F*ck* book, which has had widespread consumer reach. The *Rich As F*ck* book generates in the range of $140,000 – $250,000 in revenue every year and remains listed as a bestseller on Amazon. Additionally, the book has been featured on large billboards in high traffic areas such Times Square and West Hollywood, an expenditure of nearly $10,000. AF Inc. also hosted a book launch party for Rich As F*ck, an expense of over $16,000. Media outlets have also extensively covered the *Rich As F*ck* book. Ms. Frances and *Rich As F*ck* have been featured in magazines such as *Cosmopolitan*, *Life & Style, In Touch, Flaunt, OK!, E!, Us Weekly, Entrepreneur*, *Forbes*, *GOSS*, *The Blast*, *Entertainment Tonight*, and *Glamour UK*. Ms. Frances and *Rich As F*ck* have also been featured in numerous podcasts and blogs, such as The Mastery Matrix, The Sam Skelly Show, Earn Your Happy with Lori Harder, What Savvy Said, Wholeness with Melissa Kathryn, Striving for Felicity, and Home Cyn Home, among many others. *See* examples at Exhibit 8.

### 3. The AF Inc. Trade Dress

In addition to having trademark rights in the designation Rich As F*ck by itself, AF Inc. has trade dress rights in the unique combination of certain elements that create a distinctive look and feel used to present AF Inc.'s goods and services to consumers. Specifically, AF Inc.'s trade dress consists of a combination of the following features: (1) the word "f*ck"; (2) the acronym AF; (3) the designation Rich As F*ck; and (4) images of a woman in creative poses surrounded by dollar bills (collectively defined as "AF Inc.'s Trade Dress" or "the AF Inc. Trade Dress"). These elements in combination create an overall look and feel of an empowered modern woman celebrating her abundance and success, which is distinctive, protectable trade dress.

### C.     Defendant's Improper Conduct

Defendant Penguin Random House is one of the largest publishing companies in the world. Defendant recently began offering for presale a financial advice book authored by Vivan Tu called *Rich AF*. AF is synonymous with "as f*ck", such that the titles *Rich As F*ck* and *Rich AF* are essentially identical. *See* Exhibit 9. Because Rich As F*ck and Rich AF are essentially the same, consumers and commentators frequently refer to the *Rich As F*ck* book written by Ms. Frances as Rich AF, and, in fact, some of AF Inc's advertisements of the *Rich As F*ck* book use the shorthand Rich AF. *See* Exhibit 10.

In addition to copying the title of AF Inc.'s book, Defendant has copied elements of AF Inc.'s Trade Dress. Specifically, the cover of *Rich AF* features an image of Ms. Tu in a pose similar to images of Ms. Frances used to promote the goods and services of AF Inc., with money raining down around her:



Other images used to the promote the *Rich AF* book show Ms. Tu in a white bathtub full of dollar bills, and a photo of Ms. Tu with dollar bills fanned out in front of her. The images are strikingly similar to elements of AF Inc.'s Trade Dress. *See* the comparisons below:



(Amanda Frances)



(Vivian Tu)



(Amanda Frances (top), Vivian Tu (bottom))          (Amanda Frances (top), Vivian Tu (bottom))

The similarities between the images used to promote the *Rich AF* book and the trade dress of AF Inc. are so striking that they cannot be coincidental. Moreover, Defendant's use of the term AF, the title *Rich AF*, and the above images of Ms. Tu in the same style as Ms. Frances creates the same overall look and feel as the AF Inc. Trade Dress, such that the public is likely to associate the *Rich AF* book with AF Inc. and Ms. Frances. Consumer confusion is even more likely because Defendant is offering its book for presale through the exact same trade channels as the *Rich As*

14

*F\*ck* book, namely, Amazon, Target, Barnes & Noble, Books-A-Million, Hudson Booksellers, and Powell's. *See* Exhibit 11.

In fact, consumers have already begun expressing confusion as to whether the *Rich AF* book is affiliated with Amanda Frances and/or AF Inc. *See* the examples below[2]:



Defendant had knowledge of Ms. Frances, AF Inc., the *Rich As F\*ck* book and title, and AF Inc.'s Trade Dress well before it began promoting and offering for presale the *Rich AF* book. Specifically, Ms. Frances and AF Inc. were clearly known to Penguin Random House years ago, given its outreach to Ms. Frances in September 2019 expressing interest in publishing a book by her. Moreover, *Rich AF* is being published by Defendant under its Portfolio division, the same

---

[2] Screenshots taken from the comments section of a Nov. 6, 2023 post on the public Instagram account of Vivian Tu, @yourrichbff, promoting the *Rich AF* book.

division that initially expressed interest in publishing a book by Ms. Frances in 2019. Given the success of *Rich As F\*ck* in categories that Defendant's Portfolio division exclusively focuses on, it is implausible that Defendant was unaware of the *Rich As F\*ck* book and AF Inc., and highly plausible that Defendant knowingly and willfully infringed the Rich As F\*ck trademark rights and AF Inc. Trade Dress.

In fact, Ms. Tu acknowledged Defendant's knowledge of AF Inc. and the *Rich As F\*ck* book in a recent Instagram comment. On November 6, 2023, Ms. Tu posted a video on her public Instagram account, @yourrichbff, promoting the upcoming launch of *Rich AF*. An Instagram user posted a comment asking if Ms. Tu was aware that there is already a financial empowerment book with the same title written by Amanda Frances. Ms. Tu responded "I'm signed with Penguin Randomhouse and we did do market research! Her book was a self-published manifestation book and my team of editors felt it wasn't similar in terms of content given mine if [sic] more actual finance focused!" *See* Exhibit 12.

However, the content of the *Rich AF* book is not at issue and does not change the fact that Defendant knew about the *Rich As F\*ck* book and the success of AF Inc., and proceeded to promote a book with essentially the same title. Moreover, Defendant copied elements of AF Inc.'s Trade Dress to advertise and promote the book. This indicates that Defendant is intentionally trading on the goodwill associated with AF Inc. in order to boost sales of its own book. Additionally, *Rich AF* is branded as a "money mindset" book. The tagline on the book cover is "The Winning Money Mindset That Will Change Your Life." Therefore, Defendant is specifically targeting consumers seeking to learn how shifting their mindset and thoughts can impact financial success. These are the exact consumers who are purchasers of the *Rich As F\*ck* book and AF Inc.'s related products and services.

#### D.        Notice to Defendant

AF Inc. only recently learned of Defendant's plans to launch the *Rich AF* book, and promptly took action. On December 11, 2023, lawyers for AF Inc. served Defendant with a demand to cease and desist its plans to launch the *Rich AF* book.

Defendant acknowledged receipt of the demand letter on December 13, 3023, but has elected to disregard AF Inc.'s demands and proceed with its plans to launch the *Rich AF* book. As of the date of this filing, the *Rich AF* book remains available for preorder sales, and promotions of the book continue to be featured online and via social media.

Once the *Rich AF* book is released, continued and widespread consumer confusion is inevitable, and the harm to AF Inc. will be irreparable. Therefore, AF Inc. was left with no choice but to initiate the instant action.

### III.    LEGAL STANDARD

To prevail on a motion for a temporary restraining order or preliminary injunction, AF Inc. must show that (1) it will suffer irreparable harm absent injunctive relief, and (2) either (a) it is likely to succeed on the merits, or (b) there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in AF Inc.'s favor. *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir. 1999).

Courts readily grant preliminary injunctions and temporary restraining orders where, as here, the defendant is infringing the plaintiff's trade dress. *See, e.g., Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*, No. 15-CV-1092, 2015 U.S. Dist. LEXIS 24013 (S.D.N.Y. Feb. 26, 2015) (granting temporary restraining order where defendant was selling frozen dinners that infringed plaintiff's trade dress); *EnergyBrands Inc. v. Beverage Mktg. USA, Inc.*, No. 02-CV-3227, 2002 U.S. Dist. LEXIS 7763 (S.D.N.Y. May 1, 2002) (granting temporary restraining order against beverage label that infringed plaintiff's trade dress); *Fun-Damental Too, Ltd. v. Gemmy*

*Indus. Corp.*, 111 F.3d 993, 1007 (2d Cir. 1997) (issuing preliminary injunction against novelty coin bank design that infringed plaintiff's trade dress).

Although the Second Circuit has not ruled as to whether the two additional injunction test factors of the balance of hardships and public interest should be considered in the trade dress infringement context, some courts in this Circuit have applied these factors. *See Barefoot Contessa Pantry*, 2015 U.S. Dist. LEXIS 24013, at *6-7 (finding balance of hardships and public interest favored granting temporary restraining order against defendant infringing plaintiff's trade dress).

As detailed below, AF Inc. meets the requirements for a temporary restraining order and preliminary injunction, including the additional balancing of hardships and public interest factors.

## IV.   ARGUMENT

### A.   AF Inc. Is Likely to Succeed on the Merits of Its Claims

#### 1.   Federal Unfair Competition

Section 43(a) of the Lanham Act prohibits any person from using in commerce, in connection with any goods, "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods . . . by another person." 15 U.S.C. § 1125(a)(1). Claims of trademark infringement brought under 15 U.S.C. § 1125(a) are analyzed under the following two-prong test: (1) whether the plaintiff's mark is entitled to protection; and (2) whether the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods. *Virgin Enters. v Nawab*, 335 F.3d 141, 146 (2d Cir. 2003).

#### a)   AF Inc. Has Protectable Trademark Rights in Rich As F*ck

The Lanham Act defines the term "trademark" to include "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the

source of the goods, even if that source is unknown." 15 U.S.C. § 1127. Although the U.S. Patent and Trademark Office does not permit the registration of trademarks that consist of single book titles, the Second Circuit and other courts have long recognized that "[t]itles of works of artistic expression, including films, plays, books, and songs, that have acquired secondary meaning are protected from unfair competition under § 43(a)." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos, Inc.*, 228 F.3d 56, 63 (2d Cir. 2000), amended by 2000 U.S. App. LEXIS 30761 (2d Cir. 2000); *Rogers v. Grimaldi*, 875 F.2d 994, 997-98 (2d Cir. 1989) ("it is well established that where the title of a movie or a book has acquired secondary meaning—that is, where the title is sufficiently well known that consumers associate it with a particular author's work—the holder of the rights to that title may prevent the use of the same or confusingly similar titles by other authors."); *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 43 (2d Cir. 1994) ("Titles of motion pictures and other works of artistic expression are entitled to trademark protection under section 43(a) of the Lanham Act.").

In this case, AF Inc. has acquired secondary meaning in Rich As F*ck, such that AF Inc. has protectable trademark rights. Courts look at the following six factors when evaluating secondary meaning: (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use. *Cartier, Inc. v. Sardell Jewelry, Inc.*, 294 F. App'x 615, 618 (2d Cir. 2008). No single factor is determinative of secondary meaning, and every element need not be proved; rather, courts consider the factors together to determine, overall, whether they establish secondary meaning. *See Centaur Communs., Ltd. v A/S/M Communs., Inc.*, 830 F.2d 1217, 1222 (2d Cir. 1987).

19

Here, the secondary meaning associated with Rich As F*ck is supported by the overwhelming success and widespread consumer reach of the *Rich As F*ck* book. As discussed in the Statement of Facts above, the *Rich As F*ck* book shot to various bestseller lists immediately upon publication. To date, the *Rich As F*ck* book has sold approximately 130,000 copies, and it continues to perform well over three years after its publication. For example, *Rich As F*ck* generated over $13,000 in sales last month alone, and it continues to be featured as a Best Seller in Amazon's Kindle Store. It also has over 4,000 5-star reviews across Goodreads and Amazon.

Moreover, AF Inc. has invested significantly in advertising and promoting the *Rich As F*ck* book, and the consumer reach of such advertising has been widespread. For example, the book has been featured on large billboards in Times Square and West Hollywood, an expenditure of nearly $10,000. AF Inc. also hosted a book launch party for *Rich As F*ck*, an expense of over $16,000. Additionally, media outlets have extensively covered the *Rich As F*ck* book. Ms. Frances and *Rich As F*ck* have been featured in prominent magazines such as *Cosmopolitan*, *Entrepreneur*, *Forbes*, *GOSS*, *The Blast*, *Entertainment Tonight*, and *Glamour UK*. Ms. Frances and *Rich As F*ck* have also been featured in numerous podcasts and blogs, such as The Business Method, The Kelly Roach Show, Born to Rise, Earn Your Happy with Lori Harder, What Savvy Said, Striving for Felicity, Home Cyn Home, and TranscendZen, among many others. The majority of this coverage has been unsolicited and organic.

Defendant's attempt to plagiarize the *Rich As F*ck* title by selling a directly competing book, marketed to the same consumers, under the nearly identical title *Rich AF*, further supports a finding of secondary meaning. Finally, the *Rich As F*ck* title has been used exclusively by AF Inc. in its field of financial advice books for over three years. The only secondary meaning factor that AF Inc. cannot address relates to consumer studies. Due to the urgent nature of this action, AF Inc.

has been unable to conduct any such consumer studies. However, this factor is not dispositive, and the remaining factors overwhelming support the conclusion that AF Inc. has established secondary meaning in Rich As F*ck.

> **b)** **Defendant's Use of the title *Rich AF* Is Likely to Cause Consumer Confusion**

Consumers will likely be confused or deceived as to the origin, sponsorship, or approval of the *Rich AF* book sold by Defendant because Defendant is deliberately selling and distributing a book that infringes AF Inc.'s trademark rights in Rich As F*ck. Where an accused infringer intentionally copies a plaintiff's trademark in bad faith, there is a presumption of likelihood of confusion. *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F.Supp.3d 485, 496–97 (S.D.N.Y. 2015).

In addition to the presumption of confusion, the traditional *Polaroid* test also demonstrates a likelihood of confusion in this case. Courts consider eight non-dispositive factors when evaluating likelihood of confusion: (1) the strength of plaintiff's mark; (2) the degree of similarity between plaintiff's and defendant's marks; (3) the proximity of the products; (4) the likelihood that either owner will bridge the gap, using the mark on products closer to the other's area of commerce; (5) the existence of actual confusion; (6) the sophistication of the buyers; (7) the quality of defendant's product; and (8) good or bad faith. *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961). These factors are addressed below.

The Rich As F*ck trademark is a strong mark because, as discussed above, consumers recognize Rich As F*ck as associated with AF Inc. and Amanda Frances due to the success of the *Rich As F*ck* book, extensive advertising and media coverage, and the exclusivity of use by AF Inc. for many years. Additionally, Defendant's book title *Rich AF* is essentially identical to the

Rich As F*ck trademark, since AF is readily understood slang for "as f*ck," such that Rich AF and Rich As F*ck have the same meaning and same overall commercial impression.

The *Rich AF* book directly competes with AF Inc.'s *Rich As F*ck* book and targets the exact same consumers. In fact, Defendant has explicitly marketed its book as a "money mindset" financial advice book. Moreover, both books are sold through identical trade channels, including Amazon, Target, Barnes & Noble, Books-A-Million, Walmart, and Powell's. There is no gap to be "bridged," as it would be virtually impossible for the products at issue to be closer in commerce to each other.

Notably, there have already been instances of consumers expressing confusion as to whether the *Rich AF* book is somehow licensed by or affiliated with Amanda Frances and AF Inc. This is based on Defendant's presale activities and promotion of the book alone. These instances of actual confusion at this early stage indicate that widespread consumer confusion is inevitable if Defendant is allowed to proceed with its book launch.

The buyer sophistication factor requires the court to consider the general impression of the "ordinary consumer buying under normal market conditions and giving the attention such purchasers usually give in purchasing the product at issue." *Best Cellars, Inc. v. Wine Made Simple, Inc.*, 320 F.Supp.2d 60, 75 (S.D.N.Y. 2003). In general, the greater the value of the product at issue, the more careful the typical consumer can be expected to be, and the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace. *See Tiffany & Co. v Costco Wholesale Corp.*, 971 F.3d 74, 91 (2d Cir. 2020). Here, the products at issue are books, which are low-cost consumer products that are often impulse purchases, or purchased without extensive research and care. Therefore, the consumers at issue are not sophisticated purchasers, and this factor weighs in favor of a likelihood of confusion.

The quality of Defendant's *Rich AF* book is unknown, since the book has not yet been released. Therefore, this factor is neutral, at best. And finally, the facts indicate that Defendant has acted in bad faith, with clear knowledge of the *Rich As F\*ck* book and its association with AF Inc. Even now that AF Inc. has made Defendant aware that its presale activities are causing actual consumer confusion, Defendant has decided to continue promoting and offering for presale the *Rich AF* book, suggesting a willful intention of trading on the goodwill of AF Inc. Taken all together, the Polaroid factors overwhelmingly support a likelihood of confusion finding.

### 2.    Trade Dress Infringement Under the Lanham Act

A claim of trade dress infringement under the Lanham Act requires that (1) the claimed trade dress is either inherently distinctive or has acquired distinctiveness in the form of secondary meaning, (2) if the trade dress is inherently distinctive, it is non-functional, and (3) there is a likelihood of confusion between the plaintiff's and the defendant's goods. *Fun-Damental*, 111 F.3d at 999; *Best Cellars, Inc.*, 320 F.Supp.2d at 69.   These laws protect trademark owners and the public against the very wrong committed here—an infringer's efforts to capitalize on the recognition of an established brand.  *Inwood Labs., Inc. v. Ives Labs. Inc.*, 456 U.S. 844, 854 n.14 (1982) ("the [trademark] infringer deprives the owner of the goodwill which he spent energy, time and money to obtain").

### a)    The AF Inc. Trade Dress Is Distinctive

The standard for assessing the distinctiveness of a product's trade dress depends on the type of trade dress for which protection is sought. *Best Cellars*, 320 F.Supp.2d at 69. Trade dress is generally classified into the categories of product packaging (like water bottles), product designs (like children's clothing), or "tertium quid"—a third type of trade dress, which may include interior décor elements and/or other features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques. *Id.*, citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505

U.S. 763, 764–65 n.1 (1992). This third type of trade dress is generally treated as "akin to product packaging" and analyzed under the product packaging standard for inherent distinctiveness. *Id*. Although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry. *Id*.

The inherent distinctiveness of a trademark or trade dress is evaluated under the test set forth in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976). Under the *Abercrombie* test, trade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful. Suggestive and arbitrary or fanciful trade dress are deemed inherently distinctive and thus always satisfy the first prong of the test for protection. A descriptive trade dress may be found inherently distinctive if the plaintiff establishes that its mark has acquired secondary meaning giving it distinctiveness to the consumer. A generic trade dress receives no Lanham Act protection. *Id*. Because there is a "virtually unlimited" number of ways to combine elements to make up the total visual image that constitutes a trade dress, "a product's trade dress typically will be arbitrary or fanciful and meet the inherently distinctive requirement for § 43(a) protection." *Fun-Damental*, 111 F.3d at 1000.

The combination of elements that make up the AF Inc. Trade Dress cannot be considered descriptive or generic of financial advice products or services. It is difficult to imagine how the wording "f*ck" or AF, for example, could be considered descriptive of financial advice products or services. Rather, AF Inc.'s Trade Dress is a unique combination of elements that is arbitrary or fanciful, and therefore inherently distinctive.

In addition to being inherently distinctive, the AF Inc. Trade Dress has acquired distinctiveness and therefore has secondary meaning because consumers recognize the AF Inc. Trade Dress as a source identifier for financial advice products and services. Section IV(A)(1)(a)

24

above discusses the facts and factors establishing secondary meaning in Rich As F*ck, in particular. Beyond this, the AF Inc. Trade Dress as a whole has also acquired secondary meaning due to the sales success of AF Inc., its significant advertising expenditures, and the length and exclusivity of its use of the AF Inc. Trade Dress. Specifically, AF Inc. serves over three thousand paying consumers every year, and its products and services generate several million dollars in revenue every year. Additionally, AF Inc. spends in the range of $300,000 – $500,000 annually in expenses related to marketing and promoting financial advice products and services associated with the AF Inc. Trade Dress. Additionally, AF Inc. has been using its trade dress elements for many years in a substantially exclusive manner. Plaintiff is not aware of any other individuals or entities in the financial advice space that use a combination of the word f*ck, the designation AF, the wording Rich As F*ck, and/or images of a woman surrounded by dollar bills to promote its products or services other than AF Inc., until Defendant began its infringing activities. Moreover, Defendant's attempts at plagiarizing elements of the AF Inc. Trade Dress to promote the sale of its own book further support that AF Inc.'s Trade Dress has acquired secondary meaning.

### b)      The AF Inc. Trade Dress Is Non-Functional

The elements of the AF Inc. Trade Dress are non-functional because they are not a useful product feature, and they are not a necessary aesthetic feature without which Defendant would be unable to compete. By affording the AF Inc. Trade Dress with its proper protection and prohibiting Defendant from copying it, Defendant is still left with an unlimited number of adequate alternative book titles and design elements to use to sell and promote its own financial advice book.

### c)      A Likelihood of Confusion Exists

Defendant's intentional infringement of the AF Inc. Trade Dress again leads to a presumption of likelihood of confusion. *Louis Vuitton*, 97 F.Supp.3d at 496-97. In addition to the presumption of confusion, the *Polaroid* factors demonstrate a likelihood of confusion in this case.

As discussed above, the Polaroid factors are: (1) the strength of plaintiff's mark; (2) the degree of similarity between plaintiff's and defendant's marks; (3) the proximity of the products; (4) the likelihood that either owner will bridge the gap, using the mark on products closer to the other's area of commerce; (5) the existence of actual confusion; (6) the sophistication of the buyers; (7) the quality of defendant's product; and (8) good or bad faith. 287 F.2d at 495.

AF Inc.'s Trade Dress is arbitrary/fanciful, and therefore strong. "[T]he law accords broad, muscular protection to marks that are arbitrary or fanciful in relation to the products on which they are used . . . ." *Virgin Enters.*, 335 F.3d at 147. There is nothing descriptive or generic about use of the word f*ck, the term AF, the designation Rich As F*ck, and/or images of a woman surrounded by dollar bills, or the combination of such elements, in connection with financial advice products and services. Moreover, AF Inc.'s Trade Dress has acquired further strength and distinctiveness by gaining secondary meaning through extensive advertising, widespread commercial success, and longstanding exclusive use of the trade dress.

Defendant's book title *Rich AF* directly copies elements of the AF Inc. Trade Dress by incorporating the term "AF" and by using a title that is nearly identical to the Rich As F*ck designation. Additionally, the images of Ms. Tu used on the *Rich AF* book cover and in promotional images used to advertise the book consist of poses of a woman surrounded by dollar bills, which overlap with and are strikingly similar to the remaining elements of the AF Inc. Trade Dress. Taken altogether, the trade dress used to promote and sell the *Rich AF* book creates the same overall commercial impression as the AF Inc. Trade Dress.

Section IV(A)(1)(b) above addresses the remaining factors that establish likelihood of confusion, which are equally applicable in the context of the AF Inc. Trade Dress. In sum: the *Rich AF* book directly competes with AF Inc.'s *Rich As F*ck* book, targets the exact same consumers,

and is sold in identical trade channels; there is no gap to be bridged, since the products at issue are already directly competing; there have already been instances of consumers expressing confusion as to whether the *Rich AF* book is somehow licensed by or affiliated with Amanda Frances and AF Inc; the relevant buyers are not sophisticated for purposes of the likelihood of confusion analysis; and Defendant has acted in bad faith, with clear knowledge of the AF Inc. Trade Dress and a willful intention to trade on the goodwill associated therewith. Taken all together, the Polaroid factors overwhelmingly support a likelihood of confusion.

3.      **New York State Trade Dress Infringement and Unfair Competition**

a)      **Defendant Infringes AF Inc.'s Trade Dress Under New York Common Law**

The standard for a showing of trade dress infringement under New York law is similar to, but lower than, the showing necessary under the Lanham Act. Specifically, there is no requirement to show secondary meaning. *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F.Supp.2d 217, 250 (S.D.N.Y. 2004), citing *Ideal Toy Corp. v. Chinese Arts & Crafts, Inc.*, 530 F.Supp. 375, 379 (1981) ("Under New York law, even if plaintiff does not show secondary meaning, it is sufficient to sustain the issuance of an injunction that plaintiff show that the trade dress of a second comer is confusingly similar to its own.").

For this reason, "it is sufficient to sustain the issuance of an injunction that plaintiff show that the trade dress of a second comer is confusingly similar to its own." *Id*. at 379.  Thus, for all the reasons stated above in the section of infringement under the Lanham Act, Defendant has committed trade dress infringement in violation of New York law.

b)      **AF Inc. Has a Strong Claim for Unfair Competition Under New York Law**

A claim for unfair competition under New York law is "almost indistinguishable" from a claim for unfair competition under the Lanham Act. *Tri-Star Pictures, Inc. v. Unger*, 14 F.Supp.2d

339, 363-64 (S.D.N.Y. 1998). The essence of an unfair competition claim is that a defendant misappropriates the results of the skill, expenditures, and labors of another. *Id*. In order for a plaintiff to demonstrate unfair competition, the plaintiff must show a likelihood of confusion or deception of the consuming public as to the source of the infringing product, and bad faith on the part of the defendant. *Id*.

The sections above discussing the Lanham Act claims demonstrate that a likelihood of confusion exists as to the source of Defendant's infringing Rich AF book. Additionally, Defendant has knowingly and intentionally copied the Rich As F*ck title and elements of the AF Inc. Trade Dress, establishing bad faith. As such, AF Inc. is likely to succeed on its unfair competition claim under New York law.

### 4.    Unfair Trade Practices

AF Inc. is likely to succeed on its claim of deceptive acts and practices unlawful under New York General Business Law § 349.  New York's deceptive business acts law proscribes "[d]eceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.  N.Y. Gen. Bus. Law § 349.  A party must show that "(1) defendant engaged in a consumer-oriented act, (2) that the consumer-oriented act was misleading in a material way, and (3) that plaintiff consequently suffered injury." *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 325 n.7 (S.D.N.Y. 2010). The standard tracks Section 43(a) of the Lanham Act. *See Gucci Am., Inc. v. Gucci*, No. 07 Civ. 6820 (RMB)(JCF), 2009 U.S. Dist. LEXIS 124888, at *69 n.17 (S.D.N.Y. Aug. 5, 2009)(standards for claim under § 43(a) of the Lanham Act substantially the same as those for § 349 claims) (citing *Avon Prods. v. S.C. Johnson & Son, Inc*., 984 F.Supp. 768, 800 (S.D.N.Y. 1997)).  Here, as discussed above, Rich AF book is advertised and promoted to consumers in an effort to mislead them.  Further, as discussed in Section II, AF Inc. has suffered injury, because the AF Inc. Trade

28

Dress and associated goodwill are being damaged as a result of consumers' false association of AF Inc. with the *Rich AF* book published by Defendant and author Vivian Tu.

### 5.    Unjust Enrichment

The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover. As discussed above, AF Inc. is likely to succeed on its Lanham Act and unfair competition claims, and for those reasons, AF is likely to succeed in its claim of unjust enrichment. Defendant has been unjustly enriched by creating and perpetuating a false association between AF Inc. and the *Rich AF* book, piggybacking on AF Inc.'s success.

### 6.    New York State Trademark Dilution

New York dilution law offers protection for a plaintiff's mark beyond what is provided by infringement and unfair competition laws in that it "protect[s] the distinctiveness of an owner's trademark from being undercut by another's similar use." *Tri-Star Pictures*, 14 F.Supp.2d at 362-63, quoting *Dreyfus Fund, Inc. v. Royal Bank of Canada*, 525 F.Supp.1108, 1125 (S.D.N.Y. 1981). To prevail on a trademark dilution claim brought under New York law, a plaintiff must show that its mark "either is of truly distinctive quality or has acquired secondary meaning" and that there is a likelihood of dilution. *Id*. The "distinctive quality" aspect of this test refers to the strength of a mark for infringement purposes, while dilution pertains to "the blurring of a trademark's product identification or the tarnishment of the affirmative associations a mark has come to convey." *Id*.

The sections above discussing the Lanham Act claims establish that AF Inc. has strong trademark rights in Rich As F*ck as well as the AF Inc. Trade Dress, in terms of both secondary meaning and inherent distinctiveness. This meets the "distinctive quality" aspect of the New York dilution test. Additionally, the sections above establish that Defendant's conduct is likely to cause

consumer confusion as to whether Defendant's *Rich AF* book is associated with AF Inc. and/or Amanda Frances. Such consumer confusion is likely to blur the status of AF Inc.'s Rich As F*ck trademark and the AF Inc. Trade Dress as being unique identifiers of AF Inc. As such, AF Inc. is likely to succeed on the merits of its New York trademark dilution claim, such that AF Inc. is entitled to injunctive relief.

**B.      AF Inc. Has Suffered and Will Continue to Suffer Irreparable Harm**

In trademark and trade dress infringement cases, where the plaintiff establishes a likelihood of success on liability, irreparable harm is presumed. 15 U.S.C. § 1116(a); *see also PAF S.r.l. v. Lisa Lighting Co., Ltd.*, 712 F.Supp. 394, 408 (S.D.N.Y. 1989) (citing *Charles of the Ritz Grp. Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1321 (2d Cir. 1987)); *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995) ("In the trade dress context, a showing of likelihood of confusion as to source will establish a risk of irreparable harm.").

Here, AF Inc. is likely to succeed on the merits, as detailed above, and therefore AF Inc. is entitled to a presumption of irreparable harm in favor of preliminary relief. Even in the absence of a presumption of irreparable harm, such harm to AF Inc., if preliminary relief is not granted, is obvious from the record. "Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*, 800 F.Supp.2d 515, 540 (S.D.N.Y.2011); *see also New York City Triathlon*, 704 F.Supp.2d at 343 ("Prospective loss of ... goodwill alone is sufficient to support a finding of irreparable harm.").

Because Defendant's infringing acts are "imminent and impending," the Court is empowered and urged to grant injunctive relief. *Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.*, 808

F.Supp. 952, 957 (E.D.N.Y. 1992) (granting preliminary injunction to prevent defendant from introducing product with design virtually identical to plaintiff's trade dress); *PDK Labs, Inc. v. Proactive Labs, Inc.*, 325 F.Supp.2d 176, 180 (E.D.N.Y. 2004) (stating that defendant's promotion of infringing product on web site and at trade shows is sufficient to violate the Lanham Act). Defendant has no right to sell the infringing products it is preparing to introduce to the market, and once it does so, AF Inc. "would likely lose control of its reputation and good will." *Essie*, 808 F.Supp. at 957.

For the foregoing reasons, immediate injunctive relief must be granted to prevent irreparable harm to AF Inc.

### C.    The Balance of Hardships and Public Interest Weigh in Favor of AF Inc.

If this Court does not grant preliminary relief, the relative harm to Defendant from not being able to release its *Rich AF* book is minimal. Indeed, when, as here, a restraining order or preliminary injunction would maintain the status quo pending resolution of the litigation, the balance of equities tips in the movant's favor. *See Perry Street Software, Inc. v. Jedi Techs., Inc.*, No. 20-cv-04539-CM, 2020 U.S. Dist. LEXIS 190503, at *21 (S.D.N.Y. Oct. 14, 2020). Defendant has yet to release its *Rich AF* book. Therefore, any order enjoining its release would leave Defendant in the position it is currently in. Furthermore, such an order would not deprive Defendant of its ability to sell its book under a title and with promotional images that do not infringe AF Inc.'s asserted rights. Thus, entering an injunction weighs in favor of AF Inc. as doing so will cause only little to no harm to Defendant's business. Moreover, granting an injunction will serve the public's interest, because the injunction would prevent consumer confusion. *See Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F.Supp.2d 489, 504 (S.D.N.Y. 2013) (finding that "the public

interest would not be disserved by the issuance of a preliminary injunction" because the plaintiff established that defendants' actions were likely to cause consumer confusion).

## V.    CONCLUSION

For the foregoing reasons, entry of an order is necessary to protect Plaintiff's trademarks and protectable trade dress, to prevent further harm to Plaintiff and the consuming public, and to preserve the status quo. In view of the foregoing and consistent with previous similar cases, Plaintiff respectfully requests that this Court enter a Temporary Restraining Order in the form submitted herewith and set a status hearing before the expiration of the Temporary Restraining Order at which hearing Plaintiff intend to present a motion for preliminary injunction.

Dated: December 19, 2023

Respectfully submitted,

By:  /s/ Thomas M. Kenny
Thomas M. Kenny
SPIRO HARRISON & NELSON LLC
363 Bloomfield Avenue, Suite 2C
Montclair, NJ 07042
(973) 232-0881
tkenny@spiroharrison.com

Joseph F. Marinelli (*pro hac vice* pending)
jmarinelli@fitcheven.com
Danielle K. Muñoz (*pro hac vice* pending)
dmunoz@fitcheven.com
Kerianne A. Strachan (*pro hac vice* pending)
kstrachan@fitcheven.com
FITCH, EVEN, TABIN & FLANNERY LLP
120 South LaSalle Street, Suite 2100
Chicago, Illinois 60603
Telephone: (312) 577-7000
Facsimile: (312) 577-7007

*Attorneys for Plaintiff*
*Amanda Frances, Inc.*